Approved: _____
EUN YOUNG CHOI / DINA MCLEOD
Assistant United States Attorneys

Before:    THE HONORABLE SARAH L. CAVE
           United States Magistrate Judge
           Southern District of New York

**21 MAG 3112**

- - - - - - - - - - - - - - - - - - - -X
                                        :   **SEALED COMPLAINT**
UNITED STATES OF AMERICA                :
                                        :   Violations of
     - v. -                             :   18 U.S.C. §§ 371,
                                        :   1031, 1343, 1349,
                                        :   1956, and 2
APOCALYPSE BELLA,                       :
                                        :   County of Offense:
           Defendant.                   :   NEW YORK
                                        :
- - - - - - - - - - - - - - - - - - - -X

SOUTHERN DISTRICT OF NEW YORK, ss.:

ZACHARY EFFTING, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), and charges as follows:

### COUNT ONE
### (Conspiracy to Commit Major Fraud Against and Defraud the United States)

1.  From at least in or about March 2020 to the present, in the Southern District of New York and elsewhere, APOCALYPSE BELLA, the defendant, together with others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States and to defraud the United States and an agency thereof, to wit, the United States Small Business Administration ("SBA").

2.  It was a part and an object of the conspiracy that APOCALYPSE BELLA, the defendant, together with others known and unknown, willfully and knowingly would and did execute and attempt to execute, a scheme and artifice with the intent to defraud the United States, and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, in a grant, contract, subcontract, subsidy, loan, guarantee, insurance, and other form of Federal assistance,

including through an economic stimulus, recovery and rescue plan provided by the Government, the value of which was $1,000,000 and more, to wit, BELLA engaged in a scheme to obtain at least approximately $25 million in Government-guaranteed loans for various companies (including two companies, "Company-1" and "Company-2"), by means of false and fraudulent pretenses, representations, and documents, through the Paycheck Protection Program (the "PPP") of the SBA, designed to provide relief to small businesses during the novel coronavirus/COVID-19 pandemic.

3. It was a further part and an object of the conspiracy that APOCALYPSE BELLA, the defendant, together with others known and unknown, willfully and knowingly would and did defraud the United States, and an agency thereof, to wit, BELLA engaged in a scheme with others to obtain at least approximately $25 million in Government-guaranteed loans for various companies, including Company-1 and Company-2, and thereby defraud the SBA, by means of false and fraudulent pretenses, representations, and documents, through the Payment Protection Program.

4. In furtherance of the conspiracy and to effect the illegal objects thereof, APOCALYPSE BELLA, the defendant, and others known and unknown, committed the following overt act, among others, in the Southern District of New York and elsewhere:

a. In or about July 2020, at BELLA's direction, a co-conspirator not named herein ("CC-1"), who was located in the Southern District of New York and acts as an agent of both Company-1 and Company-2, caused a total of approximately $729,550 in proceeds from fraudulently procured PPP loans to be transferred to an account controlled by BELLA.

(Title 18, United States Code, Section 371.)

**COUNT TWO**
**(Major Fraud Against the United States)**

5. From at least in or about March 2020 to the present, in the Southern District of New York and elsewhere, APOCALYPSE BELLA, the defendant, willfully and knowingly executed, and attempted to execute, a scheme and artifice with the intent to defraud the United States, and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, in a grant, contract, subcontract, subsidy, loan, guarantee, insurance, and other form of Federal assistance, including through an economic stimulus, recovery and rescue plan

2

provided by the Government, the value of which was $1,000,000 and more, to wit, BELLA and others engaged in a scheme to obtain at least approximately $25 million in Government-guaranteed loans by means of false and fraudulent pretenses, representations, and documents, including for Company-1 and Company-2, through the PPPP.

(Title 18, United States Code, Sections 1031 and 2.)

### COUNT THREE
### (Wire Fraud Conspiracy)

6.   From at least in or about March 2020 to the present, in the Southern District of New York and elsewhere, APOCALYPSE BELLA, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

7.   It was a part and an object of the conspiracy that APOCALYPSE BELLA, the defendant, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, knowingly transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, which affected a financial institution, to wit, BELLA and others engaged in a scheme to obtain at least approximately $25 million in Government-guaranteed loans by means of false and fraudulent pretenses, representations, and documents, including Company-1 and Company-2, through the PPP, including the online submission of PPP loan applications transmitted from the Southern District of New York.

(Title 18, United States Code, Section 1349.)

### COUNT FOUR
### (Wire Fraud)

8.   From at least in or about March 2020 to the present, in the Southern District of New York and elsewhere, APOCALYPSE BELLA, the defendant, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, knowingly transmitted and caused

3

to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, which affected a financial institution, to wit, BELLA and others engaged in a scheme to obtain at least approximately $25 million in Government-guaranteed loans by means of false and fraudulent pretenses, representations, and documents, including for Company-1 and Company-2, through the PPPP, for which fraudulent PPP loan applications were accessed online from the Southern District of New York.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT FIVE
### (Money Laundering Conspiracy)

9.  From at least in or about March 2020 to the present, in the Southern District of New York and elsewhere, knowingly did combine, conspire, confederate, and agree together and with each other to commit money laundering, in violation of Title 18, United States Code, Section 1956(a)(2)(A).

10. It was a part and an object of the conspiracy that APOCALYPSE BELLA, the defendant, and others known and unknown, in an offense involving and affecting interstate and foreign commerce, would and did transport, transmit, and transfer, and attempt to transport, transmit, and transfer, monetary instruments and funds from a place in the United States to or through a place outside the United States, and to a place in the United States from and through a place outside the United States, with the intent to promote the carrying on of a specified unlawful activity, to wit, the wire fraud scheme charged in Counts Three and Four of this Complaint, in violation of Title 18, United States Code, Section 1956(a)(2)(A).

(Title 18, United States Code, Section 1956(h).)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

11. I am a Special Agent with the FBI and I have been personally involved in the investigation of this matter. This affidavit is based upon my personal participation in the investigation of this matter, my conversations with law enforcement agents, witnesses, and others, as well as my examination of report and records. Because this affidavit is

being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated. Where figures, calculations, and dates are set forth herein, they are approximate, unless stated otherwise.

## Overview of the Fraudulent Conduct

12. From at least in or about March 2020 to the present, APOCALYPSE BELLA, the defendant, and others were involved in a widespread scheme to prepare and submit fraudulent applications to the SBA and at least one company which processes PPP loan applications ("PPP Loan Company-1"), to obtain at least approximately $25 million in government-guaranteed loans for various companies through the SBA's PPP Program. This scheme resulted in the approval of fraudulently procured loans for Company-1 and Company-2, both located in the Southern District of New York and for which a co-conspirator not named herein ("CC-1") located in the Southern District of New York, served as a corporate agent, totaling approximately $3.969 million, and the distribution of the proceeds of these fraudulently obtained funds to a series of bank accounts located in the United States and elsewhere, including a bank account controlled by BELLA.

13. APOCALYPSE BELLA, the defendant, and others devised and executed this fraudulent scheme by conspiring with various individuals, including CC-1, who purport to own or operate or otherwise are affiliated with businesses (collectively, the "Straw Companies") that are eligible for PPP relief (collectively, the "Straw Company Agents"). These Straw Company Agents appear to be used as straw applicants in the fraudulent scheme, whom BELLA and others recruit to apply to the PPP program in the names of the Straw Companies.

14. In or about June 2020, APOCALYPSE BELLA, the defendant, and others known and unknown, along with CC-1, caused fraudulent online PPP loans for Company-1 and Company-2 to be submitted through the PPP Program. CC-1 caused documents related to Company-1 and Company-2 to be sent to CC-1's co-conspirators, including identification documents and financial statements for Company-1 and Company-2. Thereafter, BELLA and others caused fraudulent PPP applications for Company-1 and Company-2 to be prepared in CC-1's name and submitted online to PPP Loan Company-1, a company which originates PPP loans.

15.    In early July, 2020, the PPP loan applications for both Company-1 and Company-2 were approved, resulting in nearly $4 million total in fraudulently procured loans, to two bank accounts ("Company-1 Bank Account" and "Company-2 Bank Account," respectively), for each of which CC-1 serves as an authorized signatory.  Notably, the day after almost $2 million in fraudulently procured PPP funds for Company-2 was disbursed from PPP Loan Company-1 to the Company-2 Bank Account, nearly the entire amount was transferred to the Company-1 Bank Account.  Thereafter, between July and August 2020, there were significant disbursements from the Company-1 Bank Account that did not appear to meet the requirements for the use of PPP funds, including large transfers of funds to bank accounts located abroad, and the payment of approximately $729,550 in funds to a bank account in the name of a music company ("Bella Music Company") based in Oregon which was controlled by APOCALYPSE BELLA, the defendant.

### Background on SBA Lending in Response to COVID-19

16.    The SBA is a federal agency of the Executive Branch that administers assistance to American small businesses.  This assistance includes guaranteeing loans that are issued by certain lenders to qualifying small businesses.  Under the SBA loan guarantee programs, the actual loan is issued by a commercial lender, but the lender receives the full faith and credit backing of the United States Federal Government on a percentage of the loan.  Therefore, if a borrower defaults on an SBA-guaranteed loan, the commercial lender may seek reimbursement from the SBA, up to the percentage of the guarantee.  By reducing the risk to commercial lenders, the SBA loan guarantee programs enable lenders to provide loans to qualifying small businesses when financing is otherwise unavailable to them on reasonable terms through normal lending channels.  When a borrower seeks an SBA-guaranteed loan, the borrower must meet both the commercial lender's eligibility requirements for the loan as well as the SBA's eligibility requirements.

17.    The Coronavirus Aid, Relief, and Economic Security ("CARES") Act is a federal law enacted on March 29, 2020 designed to provide emergency financial assistance to the millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic.  One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and

certain other expenses through the PPP. On April 24, 2020, the Paycheck Protection Program and Health Care Enhancement Act was signed into law, authorizing over $300 billion in additional PPP funding.

18. The PPP allows qualifying small businesses and other organizations to receive unsecured loans with a maturity of two years and interest rate of 1%. PPP loan proceeds must be used by businesses on payroll costs, interest on mortgages, rent, and utilities. The PPP allows the interest and principal to be forgiven if businesses spend the proceeds on these expenses within a limited time period of receipt and use a certain percentage of the forgiven amount for payroll. The amount of PPP funds a business may receive is determined by the number of employees employed by the business and their average payroll costs for a period of 2.5 months. Businesses applying for a PPP loan are required to provide documentation, such as IRS Form W-3, to confirm that they have in the past paid employees the compensation listed on the application. The PPP is overseen by the SBA, which has authority over all loans. Individual PPP loans, however, are issued by private approved lenders who receive and process PPP applications and supporting documentation, and then make loans using the lenders' own funds.

19. The CARES Act also expanded the separate EIDL Program, which provides small businesses with low-interest loans of up to $150,000 that can provide vital economic support to help overcome the temporary loss of revenue they are experiencing due to COVID-19. To qualify for an EIDL under the CARES Act, the applicant must have suffered "substantial economic injury" from COVID-19, based on a company's actual economic injury determined by the SBA, up to $150,000. EIDLs may be used for payroll and other costs as well as to cover increased costs due to supply chain interruption, to pay obligations that cannot be met due to revenue loss, and for other similar uses. Until July 2020, the CARES Act also permitted applicants to request an advance of up to $10,000 to pay allowable working capital needs, which was expected to be paid by the SBA within three days of submission of an EIDL application to the SBA, provided the application contained a self-certification under penalty of perjury of the applicant's eligibility for an EIDL. Unlike the PPP, the SBA directly makes loans to applicants under the EIDL Program.

20. The first round of the PPP closed to new applications on August 8, 2020. On December 27, 2020, the Consolidated Appropriations Act of 2021, which included the Economic Aid to Hard-Hit Small Businesses, Nonprofit, and Venues Act (the

"Relief Act") was signed into law, which provided an additional $284.5 billion for the PPP.  Under the Relief Act, certain businesses that had already obtained a PPP loan under the original PPP were eligible for an additional "second draw" PPP loan, provided they met certain requirement.

### Company-1

21.  Based on my review of publicly available information from the website of the Delaware Department of State, Division of Corporations, I have learned, in substance and in part, that Company-1 is a Delaware limited liability company that was formed on or about April 21, 2014.

22.  Based on my review of the website for Company-1 accessible of on or about September 25, 2020 (the "Company-1 Website"), I have learned the following, in substance and in part:

    a.  The homepage of the Company-1 Website describes Company-1 as a "U.S. based firm, located in New York City. Founded in April 2014."  It describes Company-1's "current" business as "Selling [Company-1] branded products in the USA on Amazon.com.  Products launched between 2016-2018."  The Company-1 Website describes Company-1's "future" business as "building and operating commodities processing facilities in Africa that serve local and global markets cost effectively."

    b.  The Company-1 Website identifies CC-1 as the "President" of Company-1.

    c.  A business partner for CC-1 ("Individual-1") is identified as the Chief Medical Officer of Company-1.

    d.  The Company-1 Website also claims that the company's current market capitalization is "30 Million USD."

    e.  The Company-1 Website identifies six office locations around the world, including in New York City at a particular midtown Manhattan address (the "Midtown Business Address"), Dubai, Nigeria, Kenya, Ghana, and Cote D'Ivoire.

### The EIDL Application to the SBA for Company-1

23.  Based on my review of records obtained from the SBA, I have learned the following, in substance and in part, regarding

8

an EIDL application for Company-1 ("Company-1 EIDL Application"):

      a.    The Company-1 EIDL Application was submitted on or about March 31, 2020.

      b.    The Company-1 EIDL Application represented, in substance and in part, that Company-1 had 4 employees, and had gross revenues of approximately $13.7 million for the 12 months prior to the COVID-19 disaster. The application also represented that CC-1 was the CEO and fifty-percent owner of Company-1.

      c.    Individual-1 is identified as a fifty-percent owner and a secondary contact.

      d.    The address listed in the Company-1 EIDL Application for Company-1 was the Midtown Business Address and the address listed for CC-1 himself was the CC-1 Residential Address on the Upper East Side of Manhattan.

      e.    On or about May 14, 2020, the SBA authorized a $150,000 EIDL to Company-1. On or about the same day, CC-1 signed a Loan Authorization and Agreement with the SBA in which he certified, among other things, the following: "All representations in the Borrower's Loan application (including all supplementary submissions) are true, correct and complete and are offered to induce SBA to make this Loan."

      f.    On or about May 18, 2020, the Company-1 EIDL funds were disbursed to the Company-1 Bank Account. Based on records obtained from the bank which holds the Company-1 Bank Account, CC-1, Individual-1, and another individual are signatories on the Company-1 Bank Account.

### The EIDL Application to the SBA for Company-2

24. Based on my review of records obtained from the SBA, I have learned the following, in substance and in part, regarding an EIDL application for a company called [Company-2] PLLC ("Company-2"), I have learned the following, in substance and in part:

      a.    On or about March 31, 2020, an EIDL application was submitted to the SBA for Company-2.

   b. The principal of Company-2 was identified as Individual-1.

   c. Individual-1 was identified as the 100 percent owner of Company-2.

   d. The business address identified for Company-2 is a residential address on the Upper East Side of Manhattan, New York. Based on the EIDL application for Company-1, I have learned that CC-1 resides at this address (the "CC-1 Residential Address").

   e. The EIDL application for Company-2 represented, in substance and in part, that Company-2 had 2 employees, and had gross revenues of approximately $180,000 for the 12 months prior to the COVID-19 disaster.

   f. On or about July 6, 2020, the SBA authorized a $62,500 EIDL to Company-2. On or about July 17, 2020, Individual-1 signed a Loan Authorization and Agreement with the SBA in which he certified, among other things, the following: "All representations in the Borrower's Loan application (including all supplementary submissions) are true, correct and complete and are offered to induce SBA to make this Loan."

### Company-2 PPP Loan Application

 25. Based on my review of records obtained from PPP Loan Company-1, I have learned the following, in substance and in part, regarding a PPP loan application ("Company-2 PPP Loan Application") for Company-2:

   a. Company-2 PPP Loan Application is dated June 29, 2020.

   b. Company-2 PPP Loan Application lists Individual-1 as the signatory, and identified a particular email address ("Company-2 Fraudulent Email Address") for its primary email contact.

   c. Company-2 PPP Loan Application identifies Individual-1 as the primary contact but identifies the business address for Company-2 as CC-1's Residential Address.

   d. Company-2 PPP Loan Application sought a PPP loan in the amount of $1,992,673.00 — i.e., just under the $2 million

cap on PPP loan amounts allowed by PPP Loan Company-1 at that time.

  e. Individual-1 is identified as the 100 percent owner of Company-2.

  f. Company-2 PPP Loan Application represented, in substance and in part, that Company-2 had an average monthly payroll of approximately $797,070.00, had 124 employees, and that the loan funds would be used for payroll, lease/mortgage interest, and utilities. Notably, this representation as to the number of employees at Company-2 varied substantially from that contained in Company-2's EIDL Application submitted just three months previously, which, as described above, represented that Company-2 had 2 employees.

  g. On or about July 1, 2020, PPP Loan Company-1 disbursed a PPP loan in the amount of $1,992,673.00 into the Company-2 Bank Account.

  h. Based on my review of records obtained from the bank which holds the Company-2 Bank Account, I have learned that CC-1 and Individual-1 are the two signatories on the Company-2 Bank Account.

### Company-1 PPP Loan Application

  26. Based on my review of records obtained from PPP Loan Company-1, I have learned the following, in substance and in part, regarding a PPP loan application ("Company-1 PPP Loan Application") for Company-1:

  a. Company-1 PPP Loan Application is dated June 30, 2020 – i.e., the day after the Company-2 PPP Loan Application was filed - in the amount of $1,976,341.00 — i.e., just under the $2 million cap on PPP loan amounts allowed at that time.

  b. Company-1 PPP Loan Application lists CC-1 as the signatory, identified CC-1 as the primary contact, and also represented that CC-1 was the 100 percent owner of Company-1. It identified a particular email address ("Company-1 Fraudulent Email Address") for its primary email contact.

  c. Company-1 PPP Loan Application represented, in substance and in part, that Company-1 had an average monthly payroll of approximately $790,537.00, had 121 employees, and that the loan funds would be used for payroll, lease/mortgage

11

interest, and utilities. Notably, this representation as to the number of employees at Company-1 varied substantially from that contained in Company-1's EIDL Application submitted just three months previously, which, as described above, represented that Company-2 had 4 employees.

  d. Company-1 PPP Loan Application listed the address for Company-1 as the Midtown Business Address (i.e., the same address as was listed in the Company-1 EIDL Application), and the address listed for CC-1 was the CC-1 Residential Address.

  e. On or about July 7, 2020, PPP Loan Company-1 disbursed a PPP loan in the amount of $1,976,341.00 into the Company-1 Bank Account.

### Transfer of Funds out of the Company-1 Account

27. Based on my review of records obtained from the bank which holds the Company-1 Bank Account, I have learned, in substance and in part:

  a. Before the funds from the Company-1 EIDL loan were disbursed into the Company-1 Bank Account, the Company-1 Bank Account contained approximately $18,000.

  b. On or about May 18, 2020, the funds from the Company-1 EIDL loan — in the amount of approximately $150,000 — were disbursed into the Company-1 Bank Account.

  c. On or about July 2, 2020 — one day after PPP funds for Company-2 in the amount of approximately $1,992,673.00 were disbursed into the Company-2 Account — approximately $1.97 million was transferred from the Company-2 Bank Account to the Company-1 Bank Account.

  d. On or about July 7, 2020, PPP Loan Company-1 disbursed approximately $1,976,341.00 in funds pursuant to the PPP Application into the Company-1 Bank Account.

  e. Between July 6, 2020 and August 26, 2020, approximately $1.6 million was transferred out of the Company-1 Bank Account in a series of approximately 109 international wire transfers. Many of those international wire transfers were in the amount of approximately $20,000, and were facilitated through the use of bank accounts located in the Southern District of New York.

   f. Between in or about July 6, 2020 and in or about July 29, 2020, approximately 37 disbursements, in the total amount of approximately $730,000 were sent from the Company-1 Bank Account to a bank account in the name of Bella Music Company, a seemingly unrelated music company. Based on my review of corporate records from the Oregon Secretary of State, I know, in substance and in part, that Bella Music Company was incorporated in Oregon on or about June 21, 2019, and APOCALYPSE BELLA, the defendant, is listed as a principal of the company. Based on my review of bank documents for Bella Music Company's bank account, I know, in substance and in part, that BELLA is listed as the President of Bella Music Company, and is a signatory on the account.

Fraudulent Email Account-1

  28. Based on my review of records obtained from an email provider ("Email Provider-1"), I have learned the following in substance and in part:

   a. On or about June 24, 2020 — approximately one week before the submission of the PPP loan applications for Company-1 and Company-2 — an email account ("Fraudulent Email Account-1") was created using the subscriber name "Mike Shoe." Fraudulent Email Account-1 has 12 different alias email addresses associated with it.[1]

   b. Among the 12 different alias email addresses associated with Fraudulent Email Account-1 are Company-1 Fraudulent Email Address and Company-2 Fraudulent Email Address – i.e., the email addresses listed as points of contact on the Company-1 PPP Loan Application and Company-2 PPP Loan Application, respectively.

  29. Based on my review of documents from PPP Loan Company-1, I have learned, in substance and in part, that aside from Company-1 Fraudulent Email Address and Company-2 Fraudulent Email Address, PPP Loan Company-1 has identified that each of the 10 other alias email addresses associated with Fraudulent

---

[1] From information from Email Provider-1's website, I know that these alias email addresses are email addresses associated with Fraudulent Email Account-1 that can be used to send, reply to, or forward emails. In other words, the user or users of Fraudulent Email Account-1 would have the ability to use any of the 12 alias email addresses associated with that account to send or receive emails.

13

Email Account-1 were used to initiate PPP loan applications. Specifically, nine of the alias email addresses associated with Fraudulent Email Account-1 appeared on online PPP loan applications, and what appears to be the tenth alias email address – with a typographical error - appearing on an additional online PPP loan application. These 10 other alias email addresses associated with Fraudulent Email Account-1 were used in applications for eight different Straw Companies. Thus, the PPP loan applications for the eight other Straw Companies ("Straw Company PPP Loan Applications") were most likely created by the same user or users that also created the fraudulent PPP applications for Company-1 and Company-2. Notably, for two of the Straw Companies, there were two PPP loan applications initiated for each Straw Company, each of which used a different alias email addresses associated with Fraudulent Email Account-1 (including what appears to be an alias address with a typographical error, as noted above).

30. From my review of documents from PPP Loan Company-1, I have learned, in substance and in part, that the PPP loan applications associated with the Straw Companies related to the 12 alias email addresses for Fraudulent Email Account-1 - that is, Company-1, Company-2 and the eight other Straw Companies described above – requested PPP loans totaling approximately $14,820,853, which resulted in the disbursement of approved funds in the amount of $7,889,130.

31. Based on law enforcement agents' review of search warrant returns for Fraudulent Email Account-1 from Email Provider-1, I have learned the following, in substance and in part:

    a. Fraudulent Email Account-1 appeared to only contain emails related to PPP loan applications.

    b. On or about July 3, 2020, the user of Fraudulent Email Account-1 sent an email from one of its alias email addresses (the "Straw Company-1 Email Address") to a particular email address ("Subject Email Address-1"), with the subject line "it." The email message contained no text, but had as an attachment a copy of one of the Straw Companies' PPP loan applications ("Straw Company-1 PPP Loan Application").

    c. On or about July 3, 2020, the user of Fraudulent Email Account-1 attempted to send an email from the Straw Company-1 Email Address to an address which appears to be the Subject Email Address-1, but with one typographical error, again

14

with the subject line "it." Attached to the message was a resolution purportedly for Straw Company-1 to authorize Straw Company-1 to borrow a PPP loan. The Fraudulent Email Account-1 received a corresponding message indicating this message was returned as undeliverable because the recipient address did not exist.

      d.    On or about August 3, 2020, the user of Fraudulent Email Account-1 sent an email from the Straw Company-1 Email Address to a business email address associated with Company-1, which appears to be in the name of CC-1. The subject line was "[PPP Loan Company-1] forms." Attached to the email was the PPP application and a resolution purportedly for Company-1 to authorize Company-1 to borrow a PPP loan. Minutes thereafter, the user of Fraudulent Email Account-1 forwarded this email to a particular email address (the "Yumba Email Account").

      e.    Later that day, on August 3, 2020, the user of Fraudulent Email Account-1 sent an email from the Straw Company-1 Email Address to the Yumba Email Account with no subject. Attached to the email was a PPP application and a resolution purportedly for Company-2 to authorize Company-2 to borrow a PPP loan. Minutes thereafter, the user of Fraudulent Email Account-1 sent an email from the Straw Company-1 Email Address to the Yumba Email Account. The subject line was "Fw:[PPP Loan Company-1] forms." Attached to the email was the same PPP application and resolution to borrow for Company-2.

### Apocalypse Bella's Use of the Yumba Email Account

32. As described in the previous paragraph, the Yumba Email Account received fraudulent PPP application documents related to Company-1 and Company-2. For the reasons set forth below, I respectfully submit that there is probable cause to believe that the Yumba Email Account is controlled by APOCALYPSE BELLA, the defendant.

33. From my review of publicly-available domain registration information, I know that the domain name for the website of Bella Music Company was registered in the name of "Apocalypse Bell" using the Yumba Email Account.

34. Based on law enforcement agents' review of search warrant returns for the Yumba Email Account from the email provider that hosts the Yumba Email Account ("Email Provider-2"), I have learned the following, in substance and in part:

        a.   The Yumba Email Account appears to be the personal account of APOCALYPSE BELLA, the defendant, including during the timeframe relevant to this Complaint.  For instance, the Yumba Email Account contains order confirmations and receipts for goods and services delivered to BELLA at an address in Oregon ("Bella Oregon Address"), including, among other things, receipts for tree trimmings and plumbing services invoiced to BELLA's name provided at the Bella Oregon Address.  From my review of bank records, I know, in substance and in part, that the Bella Oregon Address is the address (i) associated with the Bella Music Company bank account, which received approximately $729,550 of the fraudulent funds procured through the Company-1 and Company-2 PPP Loan Applications; as well as (ii) associated with a personal bank account in BELLA's name.

        b.   The Yumba Email Account also contains a series of hotel, car, and travel reservations, again in the name of APOCALYPSE BELLA, the defendant.  These include airline reservations for eight separate flights from September through November 2020; as well as hotel reservations in Nairobi, Kenya, in November 2020; and reservations for an executive apartment in Brussels, Belgium in September and December 2020.

        c.   The Yumba Email Account also appears to include a few confirmations for travel made by APOCALYPSE BELLA, the defendant, on behalf of or to other individuals, including for CC-1.

        d.   It appears that BELLA has deleted items received by the Yumba Email Account.  For instance, although subscriber information indicates that the Yumba Email Account was created on or about December 26, 2017, the earliest emails found in the contents of the Yumba Email Account are from on or about July 28, 2020.  In other words, BELLA appears to have deleted the emails that were sent from the Fraudulent Email Account-1 that included fraudulent PPP loan application documents for Company-1 and Company-2, as described above in Paragraph 31.

        e.   One of the profile photos associated with the Yumba Email Account is an image of a very distinctive dark blue background with a bright, large white cross ("Cross Image").

16

Fraudulent PPP Loans for Other Straw Companies Used in Scheme

    35.  From my review of documents from an Internet Service Provider ("Residential ISP"), I know, in substance and in part, the following.  There is an account at the ISP for internet service for a particular residential address ("Residential ISP Account").  Residential ISP has provided a list of IP addresses assigned to the Residential ISP Account during the relevant period (the "Residential ISP Account IP Addresses").

    36.  From my review of information from the email provider that which hosts Subject Email Address-1 ("Email Provider-3")—which, as described above in Paragraph 31, received documentation from the Fraudulent Email Account-1 relating to Straw Company-1 and its PPP application); PPP Loan Company-1; and the Residential ISP, I know, in substance and in part, that the Residential ISP Account IP Addresses were used to access the accounts associated with the Subject Email Address-1, and various Straw Companies' PPP Loan Applications, in or about the same time that the Company-1 PPP Application and Company-2 PPP Application were submitted.  Specifically:

        a.  From my review of login information for the Subject Email Address-1, I know that from at least approximately May 2020 to at least October 2020, the Subject Email Address-1 was accessed using the Residential ISP Account on a regular and frequent basis, at least once every few weeks.

        b.  From my review of login information from PPP Loan Company-1, and the Residential ISP Account IP Addresses, I know that the Residential ISP Account IP Addresses were used to access 23 different PPP loan applications online, including the Company-1 PPP Loan Application and the Company-2 PPP Loan Application.  Specifically, these 23 different PPP loan applications were accessed on approximately 69 different occasions, from approximately late June 2020 to late September 2020.  These 23 different PPP loan applications resulted in requests totaling approximately $25,034,511 in PPP loans, with approximately $14,898,230 which were approved and disbursed.  Notably, the set of PPP loan applications accessed from the Residential ISP Account include approximately 11 applications which used alias email accounts for Fraudulent Email Account-1, hosted at Email Provider-1; approximately 5 applications which used email addresses which I know, from my review of documents from Email Provider-1, are alias email accounts for a second account hosted at Email Provider-1 ("Fraudulent Email Account-2"); and approximately 4 applications which used email addresses

17

which I know, from my review of documents from Email Provider-1, are alias email accounts a third account hosted at Email Provider-1 ("Fraudulent Email Account-3").

### Positive Identification of APOCALYPSE BELLA and Social Media Accounts

37. From my review of law enforcement databases, I have seen a picture of APOCALYPSE BELLA, the defendant, associated with his international travel, and have reviewed his identifying information, including his date of birth.

38. From my conversations with law enforcement, and my review of travel documentation, I know, in substance and in part, the following:

    a. Earlier today, an individual named "Apocalypse Bella" was scheduled to travel from Dulles International Airport to Addis Ababa, Ethiopia. Law enforcement officers effectuated an arrest of "Apocalypse Bella" while he was attempting to board the flight.

    b. I have reviewed photographs of (i) the arrested individual "Apocalypse Bella"; as well as (ii) a passport "Apocalypse Bella" was using to travel; and (iii) three cellular phones that were seized incident to arrest. From my review of the photographs of "Apocalypse Bella" and his passport, I believe that the "Apocalypse Bella" who was arrested is APOCALYPSE BELLA, the defendant (including the fact that photographs of the arrested individual and his passport match those in law enforcement databases for BELLA). In addition, the photograph of the three cellular phones show that each of the cellular phones has as its home screen the same distinctive Cross Image as is described above in Paragraph 34, which is a profile image associated with the Yumba Email Account.

39. From my review of posts of social media accounts, I know, in substance and in part, the following:

    a. There is a private social media account in the name of "Apocalypse Bella" that has as its profile picture the Cross Image.

    b. There is a public social media account containing the name of Bella Music Company has posted images of APOCALYPSE BELLA, the defendant, as well as images containing the Cross Image, including (i) one picture of two cellular phones which

18

appear to use the Cross Image as a home screen; and (ii) one picture of a necklace which has the Cross Image printed on a medallion hanging from a chain, worn by BELLA.  The Bella Music Company social media account has also posted numerous images of expensive designer clothing and accessories, stacks of $20 and $100 bills, what appears to be gold and diamond-encrusted jewelry, and firearms.

WHEREFORE, I respectfully request that a warrant be issued for the arrest of APOCALYPSE BELLA, the defendant, and that he be arrested and imprisoned or bailed, as the case may be.

       /s *Zachary Effting* (By Court with Authorization)___
ZACHARY EFFTING
Special Agent
Federal Bureau of Investigation

Sworn to me through the transmission
of this Affidavit by reliable electronic means,
pursuant to Federal Rules of Criminal Procedure
41(d)(3) and 4.1, this 18th day of March, 2021

_____
THE HONORABLE SARAH L. CAVE
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK